FILED

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

Alexandria Division

2013 DEC -4  P 4: 18

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

---

Jeffrey Alan Kantor,

    Plaintiff,

vs.

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice,

James R. Clapper
Director of National Intelligence
Office of the Director of National Intelligence,

John O. Brennan
Director
Central Intelligence Agency,

Chuck Hagel
Secretary of Defense
United States Department of Defense,

Dr. Ernest Moniz
Secretary of Energy
United States Department of Energy,

Rand Beers
Acting Secretary
United States Department
of Homeland Security,

John Forbes Kerry
Secretary of State
United States Department of State,

Case No.    1:13CV1493-CMH/TCB

Jacob J. Lew                 |
Secretary of the Treasury      |
United States Department of the Treasury,   |

                          |

Regina McCarthy          |
Administrator              |
United States Environmental Protection Agency,|

                          |

     and                    |

                          |

Katherine Archuleta       |
Director                  |
United States Office of Personnel Management, |

                          |

     Defendants.           |

## COMPLAINT

### I. Preliminary Statement

This is a civil action wherein the plaintiff, Jeffrey Alan Kantor ("Kantor"), alleges that the United States Government illegally disclosed Kantor's personal information obtained through the Patriot Act in violation of section 223 of the US Patriot Act. Kantor asserts that this was done in an attempt to deprive Kantor of his 1st amendment right to free speech, his 4th amendment right to be secure in his house and papers, and his 5th amendment right to due process, his 6th amendment right to counsel, and his 8th amendment right to not be subjected to cruel and unusual punishment. Kantor asserts that this was done in a harassing manor and because it was done in both Washington DC and Virginia, it violated the federal anti-stalking law. Section 223 of the Patriot Act prevents the government from claiming sovereign immunity.

The United States Government illegally disclosed Kantor's personal information obtained through the Patriot Act in violations of section 223 of the US Patriot Act after Kantor Google

generated an autocompleted search of, "how do I build a radio controlled" (looking for airplane)

to "how do I build a radio controlled bomb" and the USG engaged in unconstitutional retaliatory

behavior against Kantor in response to Kantor exercising his first Amendment right to free

speech and allowed his personal information obtained from the FISA warrant to be used in group

stalking attacks (aka gang-stalking) against him as he 1) wrote about what happened in his

personal diary and later in a book that is still being written and 2) filed a lawsuit against Appian

Corporation where he discussed how the investigation included a good cop / bad cop approach

where the bad cops made anti-Semitic comments and the good cops pretended to be interested in

what the government believed were Kantor's interests (based on the information that they

gleaned from the FISA warrants). The good cops initially pretended to be interested in Kantor's

interests for investigative purposes, but after Kantor complained about the anti-Semitic approach

to the Anti Defamation League, the government had the same individuals who were initially

repeating his information to be "friends" with Kantor to instead use the information gleaned from

the FISA warrant to stalk Kantor. Each time his information was repeated back, a person would

immediately say there is a person and that person dropped dead from hypertension. If Kantor

reacted angrily to them repeating back his private information (which included conversations in

his house, conversations on his cell phone, emails that he sent, websites that he went to, and

books that he got from the library) then the person instead of saying that there is a person who

dropped dead of hypertension, would instead say that they had a neighbor who seemed like a

nice person but went on a murder-suicide. This happened dozens of times when Kantor worked

as a contractor for Appian Corporation for the US Department of Defense at Ft Belvoir in

Virginia and then it happened again in the exact same fashion at Kantor's next job where he

worked as a contractor for STSI onsite at the US Environmental Protection Agency in

Washington, DC.  While Kantor was at the Army, he was followed around after work and

individuals would say, "He has been here two years and he won't quit."  Every time Kantor went

to sit down at his desk, which was in a secure building in a secure compound in a military base, a

woman who Kantor didn't know would say, "He's been here two years and he won't quit."

Kantor was also targeted by similar group stalking attacks when he worked as a contractor at

Geneva Software on a project for the United States Department of State – although at that point

Kantor had already complained to the FBI that the stalking behavior was tantamount to a death

threat, so the group stalking attacks changed in nature.  (The catch phrase changed from a person

dropped dead after his private information was repeated to "what a trip" after a group stalking

incident).

## II.  Jurisdiction and Venue

1. Patriot Act, Title 2, Section 223: Civil liability for certain unauthorized disclosures.

18 U.S.C. § 2520(a) allows any person who has had their rights violated due to the illegal

interception of communications to take civil action against the offending party. Section 223 of

the Patriot Act (Civil liability for certain unauthorized disclosures) excluded the United States

from such civil action.

If a court or appropriate department or agency determines that the United States or any of its

departments or agencies has violated any provision of Chapter 119 of the U.S. Code, they may

request an internal review from that agency or department. If necessary, an employee may then

have administrative action taken against them. If the department or agency does not take action,

then they must inform and notify the Inspector General who has jurisdiction over the agency or department, and they must give reasons to him/her why they did not take action. A citizen's rights will also be found to have been violated if an investigative, law enforcement officer or governmental entity discloses information beyond that allowed in 18 U.S.C. § 2517(a).

The crux of this complaint is that Kantor's information was disclosed beyond what is allowed in 18 U.S.C. § 2517(a), as the government was disclosing Kantor's private information to people he dealt with on a daily basis for the purpose of harassment and group stalking, which has no legitimate investigative purpose.

U.S. Code Title 18, Section 2712: A totally new section was appended to Title 18, Chapter 121 of the US Code: Section 2712, "Civil actions against the United States". It allows people to take action against the US Government if they feel that they had their rights violated, as defined in chapter 121, chapter 119, or sections 106(a), 305(a), or 405(a) of FISA. The court may assess damages no less than US $10,000 and litigation costs that are reasonably incurred. Those seeking damages must present them to the relevant department or agency as specified in the procedures of the Federal Tort Claims Act.

18 U.S.C. Section 2261A - This law states that stalking across two states is a violation of federal law. Kantor was the target of threatening group stalking in both Virginia and Washington DC.

18 U.S.C. § 2520 – This law states that threatening a witness is a violation of federal law. Kantor was prepared to testify against Appian in his EEOC lawsuit and the group stalking at his subsequent job (as a contractor for the EPA) made reference to his correspondence between

Kantor and his former attorney at Albo & Oblon in regards to his EEOC case against Appian.

The Federal Whistle Blower Act of 1998 – Kantor, who was a federal contractor with the Army / DOD, the EPA, and the Department of State, was complaining about the government's use of anti-Semitism as an investigative technique, which is a violation of federal law. He complained about this while he was at all three positions, and during that time and beyond the government retaliated against him by having his coworkers and people outside of work engage in group stalking against him and by repeating back his private information as a form of retaliatory harassment.

2. Venue is proper in the U.S. District Court for the Eastern District, Alexandria Division under 28 U.S.C. 1391(e), in that the Defendant lives in and was doing business in this district and division, and the majority of the activities giving rise to the plaintiffs' claim took place in this district and division.

3. Section 223 of the Patriot Act gives citizens two years from the time they discover that their civil rights have been violated to sue. These privacy violations occurred between 2010 and 2013. Many of the privacy violations occurred in the last two years. Other violations that Kantor alleges occurred in 2010 and early 2011, which is beyond 2 years. However, the law says that the timeline is based on when the citizen had a reasonable chance to discover the violation. Since the PRISM program was only declassified in July of 2013, these earlier violations should not be time-barred.

Again, Kantor wishes the court to order the government to investigate and report all violations that occurred in this time frame because the government only declassified the Prism program in June of 2013 and therefore Kantor only had confirmation of these privacy violations at that point. Up until that point, a counterargument could be made that there was an air of "plausable deniability" around these privacy violations.  But now that the government has declassified PRISM, Kantor has been able to "discover" from a legal standpoint these privacy violations.

### III. Parties

4. The Plaintiff, Jeffrey A Kantor, (hereinafter "Kantor")

5. The Defendants are departments and agencies of the United States Government, (hereinafter "USG").

### IV. Facts

6. Plaintiff Kantor was employed by Appian, from April 2009 until April 2011, when he was terminated.

7. Kantor worked the entire time as a contractor for the Army at Ft Belvoir, Virginia on the Army Knowledge Online and Defense Knowledge Online systems.  Northrop Grumman was the prime vendor.  CRGT was the sub-contractor under Northrop Grumman.  Appian Corporation was a

sub-contractor under CRGT.

8. In October of 2009, Kantor used the search engine Google to try to find, "How do I build a radio controlled airplane." He ran this search a couple weeks before the birthday of his son with the thought of building one together as a birthday present. After typing, "how do I build a radio controlled", Google auto-completed his search to, "how do I build a radio controlled bomb." Kantor contends that, based on the recent revelations of the PRISM project, this spawned a Patriot Act enabled FISA warrant against Kantor, whereby the government had access to all of his private information and subsequently violated Section 223 of the Patriot Act, and Kantor's constitutional rights, by having his coworkers at three different jobs, as well as people outside of work, repeat back his private information. It is especially ironic that the government investigated Kantor as a terrorist based on a computer glitch, because Kantor actually used to work in the vicinity of Ground Zero in New York City. Kantor had a summer job in 1994 working for Merrill Lynch, which was in a building that was attached to the World Trade Center, and Kantor would enter and exit the building everyday through the lobby of the World Trade Center to get to his cubicle. Instead of going after actual terrorists, the government has been investigating innocent people and violating their civil and constitutional rights in the process. It is also ironic, because at the time of the Google search Kantor was working as a contractor for the US Army and Department of Defense on a project that Kantor had been told was funded by "War on Terror" funding. The crux of this lawsuit is to send a strong message to the US government that despite the government's concerns about future terrorist attacks, they do not have carte blanche to violate the civil and constitutional rights of US citizens.

9. Kantor was studying chemistry at the time at George Mason University ("GMU").  Kantor was taking the courses in anticipation of applying to medical school.  He was therefore concerned about the possibility that the Google search in conjunction with his studying chemistry at GMU might result in some type of government investigation.

10. In response to the leaks by Eric Snowden, the USG in June 2013 declassified the existence of a program where the NSA monitored Google servers for terrorism related data.

11. The google search occurred over a weekend.  The following week, all of the other workers in Kantor's area met with government investigators.  The coworkers in his cubicle area were Stephanie Buchner and Qem Lumi, who worked for Northrop Grumman, JR Ector and Li Min, who worked for CRGT, and Tony Nemil, who worked for a company that was a sub-contractor to Northrop Grumman.

12. After the meeting between the government investigator and all of the other members of Mr. Kantor's work area, Stephanie Buchner, of Northrop Grumman, said within earshot of Kantor, that the meeting was with a government investigator, that it was really strange and that she couldn't believe it, but she would not tell Kantor the details of the meeting.

13. All of the members of Kantor's work area started pretending to be interested in Kantor's hobbies and interests with one exception: Tony Nemil started making a series of anti-Semitic comments.  Kantor is Jewish.  This seemed to be a good cop / bad cop approach.  Tony Nemil made anti-Semitic comments repeatedly over the course of five months of sitting next to Kantor, who was one of the few Jewish contractors at the Army Knowledge Online project.  Tony Nemil

would say that different Jews, including the Rothschilds, were trying to run control the US

government through the central bank, which is a common falsehood promoted by various anti-

Semitic hate groups, and was used by the government to try to provoke some type of reaction in

Kantor in a good cop / bad cop approach.

14. Kantor's other coworkers who attended the meetings with the investigator(s) initially

repeated back Kantor's private information in this good cop / bad cop approach. But in mid 2010,

the disclosure of Kantor's private information to his coworkers morphed from them pretending to

be interested in his private information for the purposes of befriending him to them repeating

back his private information for the purpose of stalking him. Kantor concedes that initial

disclosure of private information may have been done for the purposes of an investigation, but

the later disclosures had no legitimate investigative purpose and were done purely for the

purpose of harassment.

15. One day in 2010, Kantor went to an adult web site from his home computer. The next day at

work, a CRGT manager, Tony Buzanca, came up to Kantor, who was working at his computer,

bent over and whispered in Kantor's ear, "people who go to porn sites are going to hell." Kantor

contends that the government monitored Kantor's internet traffic, disclosed this private

information to Buzanca, and had Buzanca repeat it back to Kantor for the purpose of harassment

and group stalking. There was no legitimate investigative purpose to this disclosure of Kantor's

private information, which must have been obtained through the Patriot Act enabled FISA

warrant.

16. Kantor's coworkers at the army, including Northrop Grumman contractors Qem Lumi, Stephanie Buchner and Mike Steinbeck, would repeat back Kantor's private information including emails, websites he went to, library books he got from the library, conversations he made in his house or in his car, phone calls, information about the contents of his house, and then someone would immediately say that there is a person who dropped dead from hypertension. To be clear, his coworkers would initially not utter a catch phrase of dropping dead after they repeated back his information. After Kantor complained to the Anti-Defamation League ("ADL"), they began repeating back his information and then immediately talk about people dropping dead from hypertension. Prior to Kantor complaining to the ADL, his coworkers would repeat back his information, smile, and walk away without waiting for a response. After he complained to the ADL, they would repeat back his information, and immediately say that a person drops dead from hypertension (if Kantor didn't get angry when his information was repeated back) or they would say that they have a neighbor who seemed like a nice guy but then went on a murder-suicide (if Kantor had reacted angrily after his private information was repeated back to him).

17. In October of 2010, Kantor's manager at Appian, Mike Kang, made a statement that implied that Kantor was under investigation and that Northrop Grumman employee Stephanie Buchner was filling out investigation reports on him. As far as this making the privacy violations time-barred, Kantor would point out that when he complained officially (and got fired) he was officially told that there was no investigation and when Kantor filled out FOIA requests with the NSA, the Army, and the FBI seeking information on whether the government had monitored his Google search or whether there was an investigation, his FOIA requests were all denied on the

grounds of national security.

18. In January of 2011, Kantor complained to the Anti Defamation League about what he perceived as the government's use of anti-Semitism as an investigation technique. Kantor told Stephanie Buchner that he had filed the complaint with the Anti-Defamation League and verbally accused Stephanie Buchner of being involved with what was going on including Tony Nemil making the anti-Semitic remarks. As Kantor complained publicly about the investigatory misconduct, the group stalking and privacy violations became severe (they occurred daily, instead of once every two or three weeks). Prior to complaining in January of 2011, Buzanca would repeat back Kantor's information, smirk, and walk away before Kantor could react or say anything. But after Kantor complained to the ADL, his coworkers would repeat back his information and then someone would immediately say that there was a person who dropped dead of hypertension. This happened dozens of times.

19. If Kantor ever got angry after his private information was repeated back (by slamming a cabinet or typing loudly on his computer), the CRGT and Northrop Grumman employees would tell the same story about how there was neighbor in their community who seemed like such a nice guy, but then went on a murder suicide. If Mr Kantor stayed calm after they repeated back his private information, they would instead spend the hour talking about how people drop dead from hypertension. This happened every day for almost three months.

20. Every time Kantor walked to his cubicle during his last two weeks on the Army Knowledge Online project, an African-American woman would say as he passed, "He has been here two years and he won't quit." Kantor had been on the project two years. This happened every time

Kantor walked to his desk, which was multiple times a day.

19. The final week before Kantor requested that Appian transfer him to another project, the stalking started occurring outside of work. Two days before Kantor requested to be transferred, he drove to a park area of Ft Belvoir after work. He hiked on a trail and returned to his car, which was in an isolated area (where no one normally parks). There was a van next to his car and there were three men. As Kantor returned to his car, one man said to the other, "He has been here two years and he won't quit. I guess he is trying to prove a point." Kantor later discovered that an antenna had been affixed to his Audi A4. The government must have been using GPS tracking to track Kantor and the stalkers were using this GPS information to follow Kantor around and stalk him. In the wake of the Snowden revelations, there have been stories in the media that the government can also use a person's phone to engage in GPA tracking and eavesdropping (even when the person is not on a call).

Kantor was able to ignore the group stalking that had occurred at his office up until this point, but was very concerned that being followed outside of work represented a whole new threat level. It was at this point that he decided to ask Appian management to transfer him to another project. He also consulted with his father, an attorney in New Jersey, who advised Kantor to specifically mention to Appian that the harassment included anti-Semitism.

20. All of the people participating in the group stalking that Kantor knew of were CRGT and Northrop Grumman personnel, with one exception. His manager, Mike Kang, had participated in one occasion in the group stalking. Kantor had driven to lunch with his Appian manager, Mike Kang. Mike Kang asked Kantor what movies his wife likes. Kantor answered and politely asked

Mike Kang what movies his wife likes. Kang stated that his wife likes "the Girl with the Dragon Tattoo" and the "Harry Potter" movies. Kantor thought that this was strange since at the time the only version of "the Girl with the Dragon Tattoo" that existed was in Swedish and Harry Potter was a kids' movie. Kantor also thought this was disturbing because those were the exact two books that he was reading, and he had borrowed these books from his local library. The second book Kantor was reading to his son. When Kantor returned to his office, the CRGT manager, Tony Buzanca, immediately asked Kantor what books he was reading, smirked, and walked away without waiting for a response.

21. This same CRGT manager, Tony Buzanca, had repeated back Kantor's private information on numerous other occasions. He would typically repeat back his private information, smirk, and then walk away not waiting for a response. The private information that he would repeat back would typically be very sensitive things that Kantor did now want to publicly discuss or disclose. At the time, Kantor did not know how Tony Buzanca or the other Northrop Grumman and CRGT employees had gained access to his private information.

At one point, a Northrop Grumman worker, Evol, who Kantor was friendly with at the army, was leaving Army Knowledge Online ("AKO") to go to work for the U.S. Patent & Trademark Office. Kantor had a discussion over whether or not patents are issued too liberally to open-ended ideas (versus specific inventions). The same CRGT manager, Tony Buzanca, who made a lot of the previous comments, started talking about the perfect example of patents being issued for open-ended ideas is the patent given to "the guy" (he was referring to Robert Millikan) that had an invention to calculate the mass/charge ratios of oil droplets. The desk in my bedroom had a 1500

page chemistry book that was opened to a page that had a diagram and description of the

Millikan oil drop experiment that the CRGT manager was describing (and it had probably been

at that page for at least a couple weeks since I had left it at that spot and hadn't been looking at

my Chemistry textbook for a while). Kantor said to the CRGT manager, Tony Buzanca, that

doesn't make any sense, and Kantor starts to give an example of some recent instances where the

patent office had issued patents where people in the technology community felt they were too

open-ended. He goes on to say, "No, the perfect example is this device that the guy (Millikan)

had for calculating the mass/charge ratio of oil droplets," and he goes on to give a careful

description of the diagram. Later, Kantor actually looked to see if there even was a patent for the

device and could not find any evidence that Robert Millikan even applied for a patent on the

device. This illustrates the fact that the CRGT manager probably made this statement for the sole

purpose of pointing out that he knew details of my house – most likely via a "sneak and peak"

search of Kantor's Virginia house enabled via a Patriot Act FISA warrant.

22. Kantor does not know and may never know the exact purpose behind this harassment.

Kantor suspects that it was being done in retaliation for his reporting the use of anti-Semitism as

an investigative technique to the Anti Defamation League. Kantor has subsequently filed

FOIA/PA requests with the FBI, the NSA, and the Army, and they were all denied. At the time

that Kantor complained though, he had information from his Appian manager that it was an

investigation, and the CRGT manager had implied that everyone in his cubicle area was in on it

together, which implied that Tony Nemil, who made the anti-Semitic comments, was also in on it.

23. Kantor had overheard CRGT employees talking about him in the restaurant inside the engineering compound at Ft Belvoir. Kantor had never disclosed to anyone he worked with that he was planning on applying to medical school. They said that Kantor was applying to medical school, he thought that everyone was out to get him, and that the trunk of his car was being searched for an AK-47. At the time someone was shooting military targets in the Northern Virginia area including the Pentagon, the Marine Corps museum, and a Marine Corps recruiting station in Chantilly, Virginia. At the time, FBI profilers were publicly stating that the suspect was someone with ties to the military that had a grudge against the military. Kantor worked as a contractor for the military, however, he has no grudge against the military other than the harassment that occurred. In fact, Kantor worked tirelessly to help the military on the AKO project. Kantor was literally on call 24/7 and received support calls around the clock – day and night – and always provided support. The person in this shooting later turned out to be a disgruntled marine. Kantor's manager, Mike Kang, asked Kantor numerous times about these shootings as they were occurring.

24. Kantor complained to Appian on Wednesday morning, after having been followed after work on Monday and Tuesday. Chris O'Connell, a director in charge of Appian's federal consulting division, told Kantor initially that he would reassign him to another project. Kantor was interviewed by Chris O'Connell and the Appian Human Resources Manager. Kantor met Chris O'Connell on Thursday and turned in his army security badge. Kantor was scheduled to take a vacation day on Friday.

25. The following Monday, when Kantor went to report to Chris O'Connell's office at Appian's Reston headquarters, Kantor was terminated. Kantor was told that he had requested to work on a non-DOD project (because he felt he was being harassed) and they did not have any open positions on a non-DOD project.

26. Kantor then asked to be assigned to the other DOD project that was not with the army, which he was told had openings. He was told that they couldn't assign Kantor to another project since he felt that there was a government conspiracy against him.

27. After having been fired by Appian in April 2011, Kantor was hired in May of 2012 by STSI to work on a project for the Environmental Protection Agency.

28. On numerous occasions, as Kantor pursued his legal case against Appian (at his now former job) and began working on a book about how the government had violated Kantor's constitutional rights, his STSI coworkers again started meeting with government investigators and again repeated back Kantor's private information including his emails, websites he went to, and conversations that he had in his house. When Jose Cruz would repeat back Kantor's information he would do it in a whiny high-pitched voice that he never used otherwise. He was clearly doing this for the purpose of harassing Kantor and not for the purpose of befriending Kantor. So there was no legitimate investigative purpose to his actions. Again, it was harassment that went beyond the scope of any legitimate investigative purpose. Section 223 only permits private information to be disclosed for legitimate purposes. But repeating back Kantor's private information in a whiny high-pitched voice and uttering a catch phrase (which is modus operandi for group stalking) is not a legitimate investigative technique.

29. When Kantor got angry and slammed his desk drawer, his coworkers told the exact same story that his coworkers at Appian told when he got angry and slammed his desk drawer. They said that they had a neighbor in their community who seemed like such a nice guy but then went on a murder-suicide. His STSI coworkers were uttering the same catch phrase after repeating back Kantor's private information at the EPA that his coworkers at the army would utter after repeating back Kantor's private information. His STSI coworkers who were doing this included Jose Cruz, Gary Waymire, Kader Karim, Sue Chand, and Jeremy Brodie.

30. One of the emails that they repeated back was an email between Kantor and his attorney in regards to the EEOC case against Appian corporation. Kantor feels as if this act constitutes witness intimidation since Kantor was going to have to potentially testify against Appian Corporation. Intimidating a witness is a federal crime.

31. One day in December 2011, after Kantor's STSI coworkers repeated back his private information, his coworker Sue Chand asked Kantor what Metro Stop he had parked at that day. Kantor told Sue Chand he uses three different metro stops. She asked again what stop he had parked at that day. Kantor again said that he uses three different stops. For a third time, she grilled Kantor about what stop he parked at today. Kantor told her he had parked at Dunn Loring station that morning. As Kantor left work that afternoon, he was followed by an African-American man in a suit. The man sat across from Kantor on the Metro train. At the West Falls Church exit, which is one stop before the Dunn Loring exit, the man got up and started screaming at the top of his lungs at Kantor, "You respect my privacy, I'll respect your privacy, bitch!" He screamed this around five times at Kantor at the top of his lungs, and then got off the

train right as the doors were about to close.

32. Because Kantor was working onsite at EPA Headquarters in Washington, DC during the later part of his work for the EPA (from October 2011 through January 2012), and because the the group stalking had occurred at the EPA headquarters in Washington DC and in Virginia, the stalking had thus occurred in two states and this became a federal crime, since the federal anti-stalking law covers stalking that occurs between two states.

33. In one of the final instances of group stalking in December 2012, Kantor told his son in his house that he thought that travelling amusement parks weren't as safe as amusement parks that aren't travelling. The next day at work his boss, Gary Waymire, told a story about how he used to work at as a roadie for a travelling circus and he didn't think the rides were as safe. He then said that when he was at Disney World a woman dropped dead on space mountain because, "somebody fucked with her head." He said that she didn't drop dead that day, but instead dropped dead the next day. He also sent Kantor an email that said, "It's the end of the world as we know it." Kantor forwarded the email to his house. The next day he showed his father, Lawrence Kantor Jr, the email, with the title, "It's the End of the World as We Know It" and Kantor's browser history, which showed that he had emailed for the chords and lyrics to REM's. "It's the End of the World as We Know It" the night before his manager sent him the email. This group stalking had occurred hundreds if not thousands of times, but this was an instance where there was digital proof and a witness on Kantor's side that had seen it in action.

34. Kantor then complained to the FBI. On January 3, 2012, Kantor went to FBI headquarters and reported the stalking, and said that by following it up with a story of someone dropping dead,

they were in essence making a veiled death threat. The agent at the FBI refused to give out his name. He gave Kantor a card and told him to make a call to a number for an investigator.

35. Kantor called the investigator the following morning. The FBI investigator on the phone, who was a woman, also refused to give Kantor her name or identification. She told Kantor that he was crazy and should go see a psychiatrist. Kantor continued to complain. At the end of the call the investigator told Kantor he had the option of complaining to the Justice Department's Civil Rights Division.

36. Kantor never had the opportunity to complain to the Justice Department's Civil Rights Division, because as soon as he went to work on January 4th, he was fired by STSI. STSI said that the FBI contacted the EPA security division, who contacted them. They wanted an explanation for Kantor complaining about STSI having made a death threat. Kantor told them that the conversation between himself and the FBI was private. STSI sent Kantor home and fired him by telephone later that afternoon.

37. In January 2012, Kantor was out of work and continued working on his book about his situation and about how the Patriot Act had the potential for abuse. Kantor then became the target of group stalking outside of work. Kantor attended Boy Scout functions where the other parents, who were government contractors for the Department of Defense and the Department of Homeland Security, would repeat back Kantor's private information. They would then tell stories about how one of the other parents was "going to the nut house in West Virginia for people that leak classified information." Every time Kantor got up and walked away from the table where the other parents were, someone would yell, "paranoid schizophrenic!" at Kantor

from behind his back.

38. Kantor became a sub-contractor of Geneva Software (through a company called Latitude) in March of 2012 and became a full-time employee of Geneva Software in October of 2012. Kantor worked for the first three months on a system that allowed different agencies to track intelligence information. Kantor then worked on a financial system for the Department of State.

39. During the initial project, Kantor was working as a subcontractor to Tesla Corporation in Falls Church, Virginia. The Tesla employees and the Geneva Software employees engaged in group stalking against Kantor by repeating back his private information. This time they did not say the catch phrase about a person dropping dead. If Kantor did any work on his lawsuit, his book, or his diary where he documented the instances of harassment and privacy violations, Kantor would be the target of group stalking / privacy violations the next day.

40. Kantor's Geneva Software coworker, Kevin Mathews, had previously called Kantor by a Latino name that sounded nothing like his first name (Jeffrey). He had worked with Kevin for months at this time so Kevin knew exactly what his name was. Kantor would speak Spanish in his house to an au pair who works for him and there was no way Kevin Mathews should have been able to know this. This same coworker, Kevin Mathews started calling Kantor "Dr. Kantor." Kantor had been rejected for medical school the year before and was planning on reapplying to medical school for 2014. Kantor had never told anyone at Geneva Software of this and there was no way that his coworker should have known this private information. Kantor immediately questioned Kevin Mathews in an angry tone about why he was calling him "Dr. Kantor", and Kevin Mathews just mumbled something incoherent, immediately walked into a

classified work room that Kantor did not have access to and locked the door. Bear in mind that Kantor had already been the target of dozens, if not hundreds of group stalking attacks at Geneva Software. This was the proverbial straw that broke the camel's back. Kantor had been the target of hundreds of group stalking attacks where his private information had been used, and Kantor decided to turn in his resignation. Kantor questioned his manager Paul McNeil, who also participated in the group stalking, and his manager simply replied that Kevin Mathews called everyone Doctor. Kantor had not once ever heard Kevin call anyone else Doctor, even though he worked two cubicles away from him and could overhear everything in his cubicle. Kantor also questioned his manager about why he had questioned him when he returned from the outer banks last summer with the bizarre question of "Did you see any roped off sections for turtle eggs?" when he returned (which is a strange question to ask when you first see a person who is on vacation for a week) and then a few minutes later, Paul McNeil's manager, Pat McDonald, blocked Kantor's entrance into the kitchen and asked Kantor the same question, and this was the only thing he ever said to Kantor inside of the Geneva office suite in the year and a half that Kantor worked there. Kantor had in fact walked past a section of beach that was roped off. The government apparently had someone following Kantor to give this information to them for their group stalking attack. Kantor has been out of work now for several months.

41. Geneva Software employees who engaged in group stalking using Kantor's private information include Kevin Matthews, Paul McNeil, Dale Hollins, Edson Fernandes, Ed Chidester, Pat McDonald, Barry Gruber, Dan Dyke, and Chris Zika.

42. Kantor was frequently stalked outside of work also while he was working at Geneva Software. Kantor does not know the individuals who was stalking him outside of work. In the instances where he knew who the individuals were, they all had security clearances and worked as federal contractors for the USG..

43. Kantor was working on a draft of this Complaint on 8/5/2013. That evening he went to his shift at the Vienna Volunteer Fire Department, where Kantor volunteers as an operation member. Kantor in this very draft alleged that he was being wrongly investigated as a terrorist and complained overhearing his coworkers saying that his car was being searched for an AK-47. In the evening of 8/5/2013, a Vienna police officer walked into the volunteer office and said to Kantor and the three other volunteers in the room, "So this is where all the terrorists hang out. I am going to go look for an AK-47." The police officer then left. He said nothing prior to this comment and nothing after it. Kantor had never seen the police officer before or hence. This illustrates that the privacy violations and group stalking are still occurring. Is Kantor supposed to contact the town police and complain that police officers are stalking him (which is a crime that they themselves like the FBI are supposed to be preventing, instead of engaging in)?

**V. Count One**
**Against USG:**
**Violation of Patriot Act Section 223 for Willfully and Illegaly Disclosing Kantor's Private Information with No Investigative Purpose**

44. The allegations of each of the foregoing paragraphs are incorporated herein.

45. The USG violated section 223 in two ways.  By disclosing Kantor's private information to Kantor's coworkers with no investigative purpose the USG was publicly disclosing Kantor's private FOIA obtained information.  The fact is that the government had Kantor's coworkers repeat back his private information for the specific purpose of making Kantor believe that his information was being disclosed publicly. The government should not now be able to argue that the disclosure wasn't a form of public disclosure since again it was done for the specific purpose of creating the impression that Kantor's information was in fact being disclosed publicly.

46. Also, Kantor himself should be considered a member of the public and by disclosing their information to him (even though it was his information), they were illegally disclosing his private information publicly (since he is a member of the general public and was not a participant into an investigation into himself).

47. As a result of Defendants' discriminatory actions, Plaintiff has suffered lost income and lost wages.

48. Plaintiff is now suffering and will continue to suffer irreparable harm and injury as a result of Defendant's policies, practices, customs and usages as set forth herein.

49. As a direct result of Defendant's discriminatory and wrongful acts as set forth herein, Plaintiff has suffered lost wages, income and expenses, emotional distress, humiliation, embarrassment and mental anguish.

**VI. Count Two**
**Against USG:**
**Violation of Kantor's Civil Rights,**
**Including Violating his 1st, 4th, 5th, 6th, and 8th Amendment Rights**

50. The allegations of each of the foregoing paragraphs are incorporated herein.

51. The USG violated Kantor's first amendment right to free speech by engaging in group stalking against Kantor for excercizing his right to free speech. Anytime Kantor worked on his book, contacted his lawyer, or worked on his diary at his house in the evening, he was the target of group stalking and privacy violations the next day at work.

The USG also violated Kantor's first amendment right to freedom of religion by directing his coworker, Tony Nemil, to make antisemitic comments to him as part of their good cop / bad cop investigation technique.

52. By having Kantor's coworkers repeat back his private information, the USG violated Kantor's fourth amendment right to be secure in his home and papers.

Not only did they repeat back conversations in his house, conversations on his cell phone, emails that he sent, websites that he went to, books that he got from the library, but they also repeated back the contents of books that he had open on his desk in his bedroom – repeating back the contents of the exact page Kantor's 1500 page Chemistry book was open to. Presumably the government got this information from "sneak and peak" searches of Kantor's house in Virginia.

53. The USG violated Kantor's fifth amendment right to due process.

The government never tried to revoke Kantor's security clearance or to pursue criminal charges for leaking classified information. Instead a campaign of group stalking with flagrant privacy violations was used instead.

Kantor was never officially told that there was an investigation or that it was classified, so if the government ever tried to take legal action against Kantor, they would have lost. Also, the process of taking official action would have exposed the fact that there was an investigation, as Kantor had alleged, and that the anti-Semitism that was used against Kantor represented an official government-sanctioned technique. Instead of pursuing a trial with "due process" against Kantor, the government assumed Kantor was guilty, and employed government contractors to do their dirty work and use privacy violations and group stalking as a form of punishment. By using government contractors, the government distanced themselves from their criminal actions and attempted to maintain plausible deniability. But the fact is that the government contractors who were engaging in group stalking against Kantor by repeating back Kantor's private information would not have access to the information gained from the FISA warrant unless the government allowed these contractors access to the information and either:

a) directed them to engage in group stalking by ordering the federal contractors to repeat back Kantor's private information – which is the more likely scenario in light of the fact that some some of the people doing it made statements that they had complained to government investigators about what they were being forced to do; or

b) the government didn't expressly direct them to repeat back Kantor's private information, but simply allowed them access to the information and turned a blind eye as they abused the

information.

In either case, the government failed to safeguard Kantor's private information gained by the FISA warrant.

The government further violated Kantor's right to due process by not turning his case over to the Justice Department's civil rights division, but instead having the EPA discuss the matter with STSI knowing this would result in certain termination.

Furthermore, by having Kantor's STSI coworkers at the EPA mockingly repeating back Kantor's email communications with his lawyer at Ablo & Oblon and his cell phone conversations with the EEOC, the government interfered with Kantor's 4th amendment right to due process in regards to Kantor's discrimination lawsuit against Appian corporation. This also violated Kantor's 6th amendment right to counsel.

54. The group stalking and privacy violations were a form of "cruel and unusual punishment", which is a violation of Kantor's 8th amendment rights.

55. As a result of Defendant's actions, Plaintiff has suffered lost income and lost wages.

56. Plaintiff is now suffering and will continue to suffer irreparable harm and injury as a result of Defendant's policies, practices, customs and usages as set forth herein.

57. As a direct result of Defendant's discriminatory and wrongful acts as set forth herein, Plaintiff has suffered lost wages, income and expenses, emotional distress, humiliation, embarrassment and mental anguish.

## VII. Count Three
### Against USG:
### Violation of the 1998 Whistleblower Protection Act

58. Since the government was retaliating against Kantor for publicly complaining about investigators use of anti-Semitism (he was not complaining about the government's use of Google via the PRISM program) and since anti-Semitic discrimination is illegal, the government violated the Federal Whistle Blower Act of 1998.  Typically the federal Whistleblower Act applies to federal employees and contractors who do not have security clearances.  While Kantor did have a security clearance, he was never officially told that an investigation into him was classified and therefore he should still be covered by the act since as far as he knew he was complaining about an unclassified matter.

59. As a result of Defendant's actions, Plaintiff has suffered lost income and lost wages.

60. Plaintiff is now suffering and will continue to suffer irreparable harm and injury as a result of Defendant's policies, practices, customs and usages as set forth herein.

61. As a direct result of Defendant's discriminatory and wrongful acts as set forth herein, Plaintiff has suffered lost wages, income and expenses, emotional distress, humiliation, embarrassment and mental anguish.

WHEREFORE, with respect to Count 1, the plaintiff respectfully prays that this Court:

a. Issue a declaratory judgment of $10,000,000.00 for violating section 223 of the Patriot Act, which awards $10,000 for each violation (and Kantor estimates that there were 1000 violations) and punitive damages and of $45,000,000.00 for violating section 223 of the Patriot Act as well as violating Kantor's 1st, 4th, 5th, 6th, and 8th amendment rights.

WHEREFORE, with respect to Count 2, the plaintiff respectfully prays that this Court:

b. Enjoin the Defendants, departments and agencies of the US Government, from disclosing a person's private information, obtained through either the Patriot Act or any other investigative means, back to the person, and declare that this technique constitutes a form of public disclosure that is in violation of section 223 of the Patriot Act.

c. Enjoin the Defendants, departments and agencies of the US Government, from engaging in group stalking through either government employees or government contractors, and declare that this is illegal, because it is a form of punishment that is carried out without a trial, because it is a form of cruel and unusual punishment, and because it is a violation of a citizen's right to "life, liberty, and the pursuit of happiness", and issue a directive banning the government from engaging in this practice.

d. Rule that the Patriot Act is unconstitutional because there are not sufficient protections for violations of citizens' constitutional rights, due to the fact that citizen's information can be disclosed without the organization telling the citizen which agency disclosed their information, and section 223 requires the citizen to name the agency, so it is a Catch 22, thereby preventing

any real oversight.

The Patriot Act also allows the government to read a person's files and engage in retaliatory behavior against them before they ever publish their work. The jurisprudence for 1st amendment issues has always been that a person can write whatever they want in the privacy of their own home and be fully protected by the 1st amendment, but then be held responsible for the content only after they publish and/or publicize their work. But the Patriot Act allows the government to review a person's writing on their computer prior to publishing, and the government and its agents are able to engage in retaliatory behavior against the citizen prior to the citizen publishing his or her work, which is exactly what seems to have happened to Kantor. This is a gross violation of the 1st amendment. This is in violation of over two hundred years of 1st amendment jurisprudence.

c. Rule that the Patriot Act is unconstitutional, because there is the potential for it to "open Pandora's box" (e.g., allow the government to engage in all of the activity that the Patriot Act / the FISA warrant permit) but there is no administrative way for an innocent person to "close Pandora's box". Eric Snowden alleged that any low level person in the government could access all of the private information about an individual. The government responded that they could "collect" the information in bulk (against innocent citizens who have done nothing wrong) but only access the information if there was a FISA warrant. In Kantor's case, the Google auto-completed terrorism search seemingly gave the government the ammunition to get a FISA warrant against Kantor (a conjecture supported by the recent declassifications of PRISM and other NSA programs) and now tens of thousands of people in the government and tens of

thousands of government contractors (if not more) seemingly have access to all of his private information (where he goes via GPS, what he says via bugged phones and computers, where he goes on the internet, what he type in his private files on his computer, the contents of his house, who he talks to on the phone and via email and what he say, what searches he runs on his computer, what books he rents from the library) and there is no way for Kantor, who is innocent, to shut off the metaphorical valve since the FISA warrants are granted in secret and the Patriot Act doesn't give any mechanism for this. The Patriot Act only gives individuals such as Kantor the right to sue after the fact when their private information has been improperly disclosed (via section 223). But again, there is no way to have the FISA warrant revoked. In other words, even if Kantor wins this lawsuit and wins a judgment against the government for violating Section 223, Kantor has no way of knowing that the bogus FISA warrant has been revoked. Therefore the Patriot Act should be ruled unconstitutional, since it lacks this critical protection for a wrongly accused citizen's 4th amendment right to privacy and a lack of protection for their other constitutional rights as well.

Furthermore, rule that the Patriot Act is illegal because of the "sneak and peak" provisions. In Kantor's case, he never received notice, and almost four years have passed since his Google search. Yet his coworkers would psychologically taunt him by repeating back details of the inside of his house. The Patriot Act allows the government to conduct a search and delay notifying the target of the search. But the government can simply assert that there is a continuing threat and never give notification even when there is no actual threat (which is what has in all likelihood occurred in Kantor's case). This violates the jurisprudence in regards to how the judicial branch has always interpreted the use of warrants as governed by the 4th amendment.

The judicial branch has always interpreted the 4th amendment of the constitution by saying that the government must give notice when a warrant is conducted. Since there is no limit in how long the government can continue to delay notification, they can simply never notify. And if there is no notification, then there is no way to ensure that the government is complying with the 4th amendment.

f. Require the FBI to turn over all calls and contacts to the FBI where Patriot Act privacy violations are alleged to the Justice Department's civil rights division and to the new privacy advocate that President Obama stated he will create (in his speech on August 9th, 2013). Expressly forbid any other group within the government from taking any action other than contacting the Justice Department's civil rights division and the privacy advocate unless expressly approved by the Justice Department's civil rights division.

WHEREFORE, with respect to Count 3, the plaintiff respectfully prays that this Court:

g. Require the government to pay the salary that Kantor would have earned as a government contractor (approximately 10K a month) in an amount equal to the number of months that Kantor could have worked from the time that he quit his job as a federal contractor in June of 2013 (after being brutally harassed for a 3rd time) up to the point where he would receive full retirement benefits at age 70. This would add up to approximately $3,870,000.

**TRIAL BY JURY IS REQUESTED FOR ALL ISSUES TRIABLE BY A JURY.**

Respectfully submitted,

Stephen Christopher Swift
Virginia Bar No. 38419

Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688

Telephone: (703) 418-0000
Facsimile: (703) 535-8205
E-Mail: steve@swift.law.pro

*Attorney for Plaintiff Jeffrey Alan Kantor*